# HENDERSON BRIDGE COMPANY *v.* KENTUCKY.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 462.  Argued December 11, 14, 1896. — Decided March 15, 1897.

The Henderson Bridge Company was a corporation created by the Commonwealth of Kentucky for the purpose of erecting and operating a railroad bridge, with its approaches, over the Ohio River between the city of Henderson, in Kentucky, and the Indiana shore. It owned 9.46 miles of railroad and .65 of a mile of siding, making its railroad connections in Indiana, which property was assessed for taxation in that State, at $627,660. The length of the bridge in the two States, measured by feet, was one third in Indiana and two thirds in Kentucky. The tangible property of the company was assessed in Henderson County, Kentucky, at $649,735.54. From the evidence before them, the Board of Valuation and Assessment placed the value of the company's entire property at $2,900,000, and deducted therefrom $627,660 for the tangible property assessed in Indiana, which left $2,272,340, of which two thirds, or $1,514,893, was held to be the entire value of the property in Kentucky. From this, $649,735.54, the value of the tangible property in Henderson

County, was deducted, and the remainder, $865,157.46, was fixed by the Board as the value of the company's franchise. From the total value, $1,385,107 was deducted for the tangible and intangible property in Indiana, and the taxes in Kentucky were levied on $1,514,893 of tangible and intangible property in that State. The company paid the tax on the tangible property ($2762.08), and refused to pay the tax on the intangible property ($3675.91). This action was brought to recover it. The Court of Appeals held that the Commonwealth was entitled to recover it. *Held,*

(1) That the company was chartered by the State of Kentucky to build and operate a bridge and the State could properly include the franchises it had granted in the valuation of the company's property for taxation;

(2) That the tax was not a tax on the interstate business carried on over or by means of the bridge, because the bridge company did not transact such business; that business being carried on by the persons and corporations which paid the bridge company tolls for the privilege of using the bridge;

(3) That the fact that the tax in question was to some extent affected by the amount of the tolls received, and therefore might be supposed to increase the rate of tolls, was too remote and incidental to make it a tax on the business transacted;

(4) That the acts of Congress conferred no right or franchise on the company to erect the bridge or collect tolls for its use; that they merely regulated the height of bridges over that river and the width of their spans, in order that they might not interfere with its navigation; and that the declaration that such bridges should be regarded as post roads did not interfere with the right of the State to impose taxes;

(5) That the tax in controversy was nothing more than a tax on the intangible property of the company in Kentucky, and was sustained as such by the Court of Appeals, as consistent with the provisions of the constitution of Kentucky in reference to taxation; and that for the reasons given, and on the authorities cited in *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, this court is unable to conclude that the method of taxation prescribed by the statute of Kentucky and followed in making this assessment is in violation of the Constitution of the United States.

THE case is stated in the opinion.

*Mr. James P. Helm* for plaintiff in error. *Mr. Helm Bruce* was on his brief.

*Mr. William J. Hendrick* for defendant in error.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

This was an action brought by the Commonwealth of Kentucky against the Henderson Bridge Company to recover the sum of $3675.91, taxes levied against that company on an assessment made of its intangible property by the Kentucky Board of Valuation and Assessment for the year 1893.

The Henderson Bridge Company is a corporation created by the Commonwealth of Kentucky for the purpose of erecting and operating a railroad bridge, with its approaches, over the Ohio River between the city of Henderson, in Kentucky, and the Indiana shore.

The record does not show that it was also incorporated under any law of Indiana, but the company alleged that, being incorporated by the laws of Kentucky, it was granted certain powers and privileges under the laws of Indiana; though it was not denied that the company actually constructed and now owned and operated the bridge and approaches under its Kentucky charter. It was, moreover, averred that the company built its bridge under and in accordance with the act of Congress of December 17, 1872, c. 4, 17 Stat. 398, entitled " An act to authorize the construction of bridges across the Ohio River, and to prescribe the dimensions of the same," which provided that any such bridge should be recognized as a post route; and the act supplementary to that act approved February 14, 1883, c. 44, 22 Stat. 414.

It appeared that the bridge company owned 9.46 miles of railroad and .65 of a mile of siding, making its railroad connections in Indiana, which property was assessed for taxation in that State, at $627,660; that the length of the bridge in the two States, measured by feet, was one third in Indiana and two thirds in Kentucky; that the tangible property of the company was assessed in Henderson County, Kentucky, at $649,735.54; that the capital stock of the company was $1,000,000, and that it had issued bonds to the amount of $2,000,000.

From the evidence before them, the Board of Valuation

and Assessment placed the value of the company's entire property at $2,900,000, and deducted therefrom $627,660 for the tangible property assessed in Indiana, which left $2,272,340, of which two thirds, or $1,514,893, was held to be the entire value of the property in Kentucky. From this, $649,735.54, the value of the tangible property in Henderson County, was deducted, and the remainder, $865,157.46, was fixed by the Board as the value of the company's franchise.

The company's stock was worth not less than $90 per share on the market, and the bonds took precedence of the stock. The evidence showed a large amount of assets and the receipt of a large income. From the total value, $1,385,107 was deducted for the tangible and intangible property in Indiana, and the taxes in Kentucky were levied on $1,514,893 of tangible and intangible property in that State.

The tax on the tangible property amounted to $2762.08, and this, as we understand it, was paid by the company. The tax on the intangible property was $3675.91, which the company refused to pay, whereupon this action was brought for its recovery.

The state Circuit Court rendered judgment in favor of the Commonwealth for $595, which was reversed by the Court of Appeals, which held the Commonwealth entitled to recover the full amount. 31 S. W. Rep. 486. The cause having been remanded, and judgment entered accordingly, by the Circuit Court, and affirmed by the Court of Appeals, this writ of error was sued out.

The company was chartered by the State of Kentucky to build and operate a bridge, and the State could properly include the franchises it had granted in the valuation of the company's property for taxation. *Central Pacific Railroad* v. *California,* 162 U. S. 91. The regulation of tolls for transportation over the bridge considered in *Covington & Cincinnati Bridge Co.* v. *Kentucky,* 154 U. S. 204, presented an entirely different question.

Clearly the tax was not a tax on the interstate business carried on over or by means of the bridge, because the bridge company did not transact such business. That business was carried

on by the persons and corporations which paid the bridge com-
pany tolls for the privilege of using the bridge. The fact that
the tax in question was to some extent affected by the amount
of the tolls received, and therefore might be supposed to in-
crease the rate of tolls, is too remote and incidental to make
it a tax on the business transacted. This very question was
decided in *Erie Railroad* v. *Pennsylvania*, 158 U. S. 431, 439,
where it was said: "It is argued that the imposition of a tax
on tolls might lead to increasing them in an effort to throw
their burthen on the carrying company. Such a result is
merely conjectural, and, at all events, too remote and indirect
to be an interference with interstate commerce. The inter-
ference with the commercial power must be direct, and not
the mere incidental effect of the requirement of the usual
proportional contribution to public maintenance." The only
franchises treated here as the subject of taxation were those
granted by the State of Kentucky. So far as the State of In-
diana could be said to have conferred any franchise upon the
company, it was a franchise that inhered in that portion of
the structure that was within the State of Indiana, the value
of which was not included in the tax complained of.

The acts of Congress conferred no right or franchise on the
company to erect the bridge or collect tolls for its use. They
merely regulated the height of bridges over that river and the
width of their spans, in order that they might not interfere
with its navigation. The declaration that such bridges should
be regarded as post roads did not interfere with the right of the
State to impose taxes, as was decided in *Postal Telegraph Cable
Co.* v. *Charleston*, 153 U. S. 692, 700. The contrary view would
withdraw from the taxing power of the States nearly all the
railroads and stage routes throughout the country.

The tax in controversy was nothing more than a tax on the
intangible property of the company in Kentucky, and was
sustained as such by the Court of Appeals, as consistent with
the provisions of the constitution of Kentucky in reference to
taxation.

And for the reasons given, and on the authorities cited in
*Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, we are

unable to conclude that the method of taxation prescribed by the statute of Kentucky and followed in making this assessment is in violation of the Constitution of the United States.

*Judgment affirmed.*

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE FIELD, MR. JUSTICE HARLAN and MR. JUSTICE BROWN, dissenting.

A fuller statement of the facts than is given in the opinion of the court seems to me necessary in order to make clear the reasons for my dissent.

The plaintiff in error, the Henderson Bridge Company, owns and operates a bridge across the Ohio River from Henderson, Kentucky, to the Indiana shore. This bridge is largely occupied by railroad tracks, used, necessarily, solely for interstate commerce. On the Kentucky side there is an approach, and one also on the Indiana side, consisting of an embankment and a siding about nine miles in length. The corporation was chartered by the State of Kentucky. The general laws of the State of Indiana provide for the recognition of any corporation " created by the laws of another State for constructing a bridge across any river or stream forming in whole or in part the boundary between such other State and this State." It directs also the filing of a copy of the charter in Indiana, and subjects the charter of the corporation to the exercise by the State of Indiana of the power to repeal, alter or amend. The bridge in question was also authorized by act of Congress and was established as a post route. 17 Stat. 398, as amended by 22 Stat. 414. Whether the operation of the Indiana legislation was to make the bridge company an Indiana corporation, need not be considered. It is certain, however, from the facts just stated, that the bridge company possessed, first, a franchise to exist as a corporation from the State of Kentucky, and under this franchise to build and operate the bridge to the Indiana line — that is, two thirds of its length; second, that it also possessed a franchise or right from the State of Indiana, whether

a corporation under the Indiana laws or not, to build and operate the bridge and its approaches in so far as these structures were to be located in that State; third, a franchise or right derived from the United States to operate the bridge for purposes of interstate commerce and as a post route. None of these franchises were incompatible, the one with the other, and all were of such a nature as to be of value to the corporation.

The laws of the State of Kentucky under which the tax in question was levied are set out *in extenso* in the opinion of the court in *Adams Express Co.* v. *Kentucky*, this day decided, *post*, 171, and I therefore content myself with a brief statement thereof. The sections referred to are as numbered and contained in Barbour & Carroll's compilation of the Kentucky statutes in force in 1894.

Section 4019 fixes the rate of taxation and the various purposes for which taxes may be imposed. Section 4020 defines the general subjects of taxation, that is to say, the objects upon which the rate of taxation provided in the previous section are to be levied. This latter section provides that "all real and personal estate within this State, and all personal estate of persons residing in this State, and of all corporations organized under the laws of this State, whether the property be in or out of this State, including intangible property, which shall be considered and estimated in fixing the value of corporate franchises as hereinafter provided, shall be subject to taxation unless the same be exempt," etc.

It is manifest that this section clearly designates the objects of taxation to be as follows: (*a*) all real and personal estate within this State; (*b*) all personal estate of persons residing within the State; (*c*) all the property of corporations organized under the laws of the State, whether such property be in or out of the State, including the intangible property of such corporations, which property, that is, the intangible property, whether situated in or out of the State, shall be considered and estimated in fixing the value of the corporate franchises.

The statutes of Kentucky provide, as a general rule, for the assessment by the local or county officials of all real and per-

sonal property of individuals or corporations in the county, where the property is situated or the corporation established. The franchise tax embraced in the last of the foregoing enumerations is not assessed by the local authorities, but by a board of valuation and assessment, composed of the state auditor, treasurer and secretary of State; for it is said in section 4077: " The auditor, treasurer and secretary of State are hereby constituted a board of valuation and assessment, for fixing the value of said *franchises*," and a subsequent sentence makes the state auditor the chairman of the board. Section 4078 compels a return to this board showing the amount of capital stock, preferred and common; the number of shares; the amount of stock paid up; the par and real value thereof; the highest price at which such stock was sold at a *bona fide* sale within the next twelve months before the day on which the statement is required to be made; the amount of surplus and undivided profit, the value of all assets, the total amount of principal indebtedness, the amount of gross or net earnings or income, including interest on investments and income from all sources for twelve months; the amount and kind of tangible property in the State, and where situated, " assessed or liable to assessment in the State," and the fair cash value thereof estimated at the price it would bring at a fair voluntary sale, and such other facts as the auditor may require. Section 4079 provides, if the corporation have a line or lines extending beyond the limits of the State, the statement must also show the length of the entire line owned, leased or controlled in the State, and the entire line of the same company elsewhere. If the corporation be organized under the laws of any other State, or under the laws of Kentucky, but conduct its business in Kentucky as well as in other States, the statement is required to show the gross or net income or earnings received in the State and out of the State on business done in the State and the entire gross receipts of the company in the State and elsewhere during twelve months.

From the data thus obliged to be furnished to the board, the act (§ 4079) commands that the assessment of the franchises of the corporation created by the State of Kentucky

shall be made as follows (I quote): "Provided, that said board, from said statement and from such other evidence, as it may have, if such corporation, company or association be organized under the laws of this State, shall fix the value of the capital stock of the corporation, company or association, as provided in the next succeeding section, and from the amount thus fixed shall deduct the assessed value of all tangible property assessed in this State, or in the counties where situated. *The remainder thus found shall be the value of its corporate franchise subject to taxation as aforesaid.*" The following section (4080) fixes the rule for the ascertainment of the value of the capital stock by which the amount of the tax on franchises is to be arrived at, by making it the duty of the board to "*take the proportion which the gross receipts in this State within twelve months . . . bears to the entire gross receipts of the company,*" and declaring that "*the same proportion of the value of the entire capital stock, less the assessed value of the tangible property assessed, or liable to assessment, in this State, shall be the correct value of the corporate franchise of such corporation . . . for taxation in this State.*"

The bridge company was assessed by the local county officials on the bridge and other tangible property the sum of six hundred and forty-nine thousand seven hundred and thirty-five dollars and fifty-four cents ($649,735.54). The board of valuation assessed the company for the franchise tax, under the laws above stated, in the sum of eight hundred and sixty-five thousand one hundred and fifty-seven dollars and forty-six cents ($865,157.46). The constitutionality of this latter assessment and the tax levied thereupon is the issue involved.

The first question which arises is, Was the tax levied on the franchise of the corporation? In solving this question it will serve only to confuse and delude the reason if the method which has been pursued in argument is now followed, that is, of calling the levy a franchise tax in one breath and then in the next dropping that designation, and not only denominating the tax, but treating it as solely a tax on intangible property.

If the words "intangible property" be synonymous with franchise, there is no reason for shifting the name by which the object taxed is designated. If, on the contrary, intangible property and franchise are two different objects, then to call the tax first by one and then by the other name gives rise not only to inaccuracy, but to misapprehension.

That the tax is on the franchise is to me so obvious, so clear, that I fail to see how there can be doubt or question on the subject. The law under which the tax is levied, in language which nothing can obscure, designates it as a franchise tax and only a franchise tax. Can this be denied? Let the query be answered by briefly considering the law, section by section. Section 4020 says "shall be considered and estimated in fixing the value of the corporate franchises as hereinafter provided." Section 4077, the one which creates the board of valuation, declares "are hereby constituted a board of valuation and assessment, for fixing the value of said franchises." Section 4078 says "in order to determine the value of the franchises mentioned"; section 4079, that the information required of the taxpayer is for "determining the value of the franchises to be taxed." Section 4080 is no less explicit: "Shall be the correct value of the corporate franchise of such corporation, company or association for taxation in this State."

But clear as is the statute in its every line, the pleadings of the State, by which this suit was commenced, are, if possible, more so. The declaration, after reciting the levy of the assessment by the board and stating the total amount, adds that it is the sum " which said board of valuation and assessment fixed *as the value of the franchise of said defendant company.*" The language of the statute and the averment of the petition are, moreover, supported by the opinion of the highest court of the State of Kentucky, from which this case comes to this court, wherein it is announced that the tax is on the franchise. I shall quote from the opinion hereafter.

The tax being, then, a tax on franchises, the question is —

First, *Is it exclusively on the franchise to exist as a corporation granted by the laws of Kentucky?* or, second, *Is it also*

*a tax on the franchise enjoyed by the corporation from the United States, and likewise on the one accorded to the corporation by the State of Indiana, and in addition is the tax a burden laid directly by the State upon the interstate commerce business carried on by the corporation?* If it is solely on the first of these objects of taxation, of course it was within the power of the State to assess and levy it. *Central Pacific Railroad* v. *California,* 162 U. S. 91. On the other hand, if the tax is levied on all or either of the subject-matters of taxation embraced in the second enumeration, it violates the Constitution. *California* v. *Pacific Railroad,* 127 U. S. 1, and authorities cited and referred to in the dissenting opinion in *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 229.

The difference between the levy exclusively on the franchise to exist as a corporation granted by a State, and the attempt by such State to tax franchises granted by the United States or another State, or to lay a burden on interstate commerce, is well illustrated in *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* 122 U. S. 326. There a tax had been laid by the State of Pennsylvania upon the gross receipts of a domestic corporation of the State under authority of a statute which embraced certain classes of corporations, both foreign and domestic. Answering the argument that the vessels and franchises of the corporation were two kinds of personal property, and that the tax was really upon the franchises of the company, and that each kind of property was taxed without regard to the fact that it was involved in and devoted to the pursuit of interstate and foreign commerce, the court, speaking through Mr. Justice Bradley, said (p. 342):

" The second ground on which the decision referred to was based was, that the tax was upon the franchise of the corporation granted to it by the State. We do not think that this can be affirmed in the present case. It certainly could not have been intended as a tax on the corporate franchise, because, by the terms of the act, it was laid equally on the corporations of other States doing business in Pennsylvania. If intended as a tax on the franchise of doing business — which, in this case, is the business of transportation in carry-

ing on interstate and foreign commerce — it would clearly be unconstitutional."

The issue, then, is: was this franchise tax levied solely upon the franchise granted by the State of Kentucky to exist as a corporation, or was it upon all the franchises of the company and upon all its interstate commerce business? It cannot be that the Kentucky law contemplated that the assessment which it ordained, should be only on the franchise to exist as a corporation derived from that State, since the statute commands that the tax shall be laid upon all corporations doing business in the State, whether or not they hold a franchise to be a corporation from the State of Kentucky. This is shown to be the fact on the very face of the statutes, and this test was made decisive by this court as shown in the foregoing citation from the opinion in *Philadelphia Steamship Co. v. Pennsylvania.*

Let me turn to the particular provisions of the statute and ascertain upon what it commands the tax to be levied. Section 4020, in enumerating the objects of taxation which shall be assessed as part of the franchise, provides for all intangible property to be thus included in the franchise, *whether the property be in or out of the State.* Can it be said when the law in mandatory terms directs the inclusion in the franchise to be assessed of property, whether in or out of the State, that it means that only the franchise granted by the State to a corporation to exist as such shall be assessed? Examine the other sections of the law, 4077, 4078, 4079, 4080, and it is apparent that they also provide that the board *shall* consider the entire value of the corporate property, everything that it owns, in ascertaining the value of the franchise, which is the thing to be taxed. Now, when the law says that in taxing the franchise the board shall include therein all the intangible property of the corporation, whether within or without the State, and, moreover, in subsequent provisions imposes on the board the duty not simply of considering all the property in and out of the State, but imperatively says that the assessment of the franchise shall contain all this property, it seems to me that it is impossible with reason to

say that the assessment which the law required was one only on the franchise to exist as a corporation granted by the State, and was not levied on the value of the franchise made up by assessing every right which the corporation possessed, whether in or out of the State, or whether conferred by the United States or the State of Indiana.

That the board by which the assessment was made considered it to be its duty to include every thing in and out of the State and every right possessed by the corporation, is made also clear by the testimony of the state auditor, who was president of the board of valuation. The corporation had a capital stock, the par value of which was one million (1,000,000) dollars; it had besides outstanding bonds to the amount of two million (2,000,000) dollars. The president of the board stated — and his testimony is all there is on the subject in the record — that the total value was fixed, as follows :

| | |
|---|---:|
| One million (1,000,000) dollars of capital stock, which was valued at ninety (90) dollars per share | $900,000 00 |
| Two million (2,000,000) dollars of bonds, valued at par | 2,000,000 00 |
| Total | $2,900,000 00 |

As by the statute the value of the taxable franchise was to be ascertained by taking the sum determined to be the worth of the capital stock, as that term was employed in the statute, less the amount of property otherwise taxed, which was to be deducted, it follows that the franchise was embraced in the amount of this total. As the franchise was included in the total, it also results, as the part is contained in the whole, that the elements which entered into and formed a part of the total were, therefore, elements of value entering into and forming part of the taxable franchise.

Now, by what process of calculation does the president of the board declare that the sum of two million nine hundred thousand (2,900,000) dollars was reached? I quote the

" They say their gross earnings or income

| | |
|---|---|
| amounted to............................. | $209,072 21 |
| Income from all other sources ............. | 8,000 00 |
| " Total .................... | $217,072 21 |
| Less interest on bonds .......... $120,000 00 | |
| Less sinking fund ............... 21,000 00 | |
| | 141,000 00 |
| " Balance ................. | $76,072 21 |

" So that you see here the corporation paying $120,000 interest on two millions of bonds, putting $21,000 into a sinking fund, and with a net profit upon the operation of the bridge of $76,071.21, which was over seven per cent on one million of stock."

Thus the president of the board declares that the total sum out of which the taxable value of the franchise was to be ascertained was fixed at nearly two millions of dollars above the par value of the stock of the company, because the gross (not the net) earnings of the company derived from its entire interstate commerce business — its business done in Indiana as well as in Kentucky — were all treated as one. The further result of the testimony is that, because by so considering these gross earnings they established that the company realized a sum which would pay six per cent upon its bonds and seven per cent upon the par of its capital stock, therefore the gross amount, in which the franchise was included, was fixed at two million nine hundred thousand (2,900,000) dollars.

In passing it is worthy of remark that the record contains no explanation of how it could have been found that the gross earnings could have produced the result stated, in view of the fact that none of the operating expenses of the corporation were taken into consideration, and that no allowance was even made for the payment of the sum of the tax which the board proceeded to assess. Can it be said in face of the fact that the assessing officer declares that although in making up the total amount every right possessed by the corporation and all the results of its interstate business were made the basis of

Dissenting Opinion: White, Field, Harlan, Brown, JJ.

the valuation, yet that the sum so made up embraced only the mere right of the corporation to exist as such, granted by Kentucky, and did not include the rights enjoyed by the corporation under the law of the United States and the law of Indiana, and also all its gross interstate commerce earnings?

But the testimony of the president of the board as to the method of calculation by which the ultimate taxable value of the franchise was fixed at eight hundred and sixty-five thousand one hundred and fifty-seven dollars and forty-six cents ($865,157.46) is an additional demonstration that the sum of all the gross earnings from interstate commerce, and indeed everything that the corporation earned, was included in this amount.   How was this taxable value of the franchise fixed?

| | | |
|---|---:|---:|
| The total valuation was...................... | | $2,900,000 00 |
| There was deducted the follow-<br>ing assessment on the nine miles<br>of railroad in Indiana.......... | $627,660 00 | |
| Actual value of bridge estimated<br>in Kentucky................. | 649,735 54 | |
| Actual value of bridge estimated<br>in Indiana.................... | 757,447 00 | |
| Total............................. | | 2,034,842 54 |
| Balance.................... | | $865,157 46 |

That is to say, the president of the board testifies that after having used the whole gross earnings of the company, from interstate commerce, from business done in Indiana under the franchise held by that State, and also under that held by the United States, in order thereby to swell the original amount, yet when the deductions came to be made nothing was subtracted in consequence of having included in the original amount the results of the United States franchise, those of the Indiana franchise, and those arising from the entire interstate commerce business of the corporation.   As it is, in my opinion, a demonstration that these things were included in the gross amount, and as it is also a demonstration that none

of them were deducted, it follows that the taxable value of the franchise was almost wholly made up of these items. It cannot, I submit, be said that where a thing is included to make up an amount and is not subsequently deducted therefrom, it does not continue to be a part of the amount into which it originally entered. The statement of the president of the assessing board is the only testimony on the subject contained in the record. In view of the fact that he unquestionably establishes that the assessment was really on the gross receipts, I submit it leaves no room whatever for conjecture or presumption that the assessment must have been levied upon some other object of taxation.

This court has held repeatedly that a State cannot tax the gross earnings of a corporation, even though created by it, derived from interstate commerce, as the levy of such tax would be a burden on that commerce, and therefore an interference with the exclusive power of Congress over that subject. It being beyond dispute, therefore, that the sum of taxation in this case was fixed almost exclusively by the gross earnings from interstate commerce, who, may I ask, can point out the distinction between taxing the gross earnings derived from interstate commerce and taxing a valuation based on such earnings? The elementary principle so often applied by the court, that a tax which may not be imposed directly cannot be levied indirectly, is decisive. Indeed, even the application of that familiar rule is unnecessary, since the method pursued in this case is an exact and literal equivalent of a tax levied directly upon the gross earnings from interstate commerce itself.

The language of the Court of Appeals of Kentucky, whose judgment is now here for review, leaves no doubt as to how it understood the case and what it interpreted the tax to be. The opinion, in referring to the use of the words "capital stock" as a measure or instrument for the purposes of the valuation of the franchise, says (31 S. W. Rep. 491): "By this term 'capital stock' the legislature meant to include the entire property, real and personal, tangible and intangible, assets on hand, and its franchises as well; and that, when so embraced

and construed and valued as an entirety," the net balance obtained by deducting the tangible property already assessed would constitute the "value of the franchise to be taxed under section 4077." And, again, in another portion of the opinion, after reviewing the figures showing the value of the "property and the franchises of the company" (mark the use of the plural), the court said (p. 491): "So that the large earning capacity of this property, based on its tangible value only, authorizes us to assume that it lies in its franchise, which is the right to charge tolls on every locomotive, freight and passenger car, ton of freight, and passenger that passes over its road." Also (on p. 492), the court quotes from section 929 of Morawetz on Corporations, among other remarks of the author, the following: "On the other hand, franchises clearly have a value if the word 'value' is used to signify the advantage derived from their possession; or, in other words, their utility. The value of a franchise, using the word 'value' in this sense, would not be measured by the cost or difficulty of obtaining the franchise, or by its exclusive character, but by the benefit derived from its possession." The Kentucky court adds: "Thus, the value of the franchise in this case aptly illustrates the meaning of the author."

When the opinion of the court of last resort of the State, as announced in this very case, asserts that the tax is, beyond doubt, a levy upon all the property of the company in and out of the State, *that it is a tax upon the value of the exercise of the privilege of using the bridge, of charging for the running of locomotives across the bridge, and of doing the business of interstate commerce in any form,* I cannot bring my mind to the conclusion that the tax is only levied on the mere franchise to exist as a corporation conferred by the State of Kentucky.

It was doubtless the construction given by the Kentucky court to the statute which has caused the opinion of this court now announced to maintain the proposition that the traffic over the bridge which crosses the river between Kentucky and Indiana, and over which, in the nature of things, there can be, I think, nothing but interstate commerce, is not such commerce. Serious as I conceive to be the violation of the

Constitution which results from recognizing the right of a State to tax gross earnings derived from interstate commerce, the premise upon which the court thus rests its opinion, to my mind, is a yet more evident violation of the Constitution, and is more pregnant with dangerous results to our institutions.

I consider it a new and startling doctrine to say that a bridge which is situated in two States, with the sanction of the laws of both, which has been made a post route by act of Congress, is not an instrument of interstate commerce, and that the traffic which goes over such bridge is not such commerce, and that the receipts derived from or charges resulting from such business are not receipts derived from interstate commerce business. Pushed to its legitimate conclusion, this premise deprives the interstate commerce clause of the Constitution of its entire efficacy, and is, I think, in direct conflict with the Constitution as interpreted by this court from the foundation of the government. I need go no further to demonstrate this than to refer to the recent decision of this court in *Covington & Cincinnati Bridge Co.* v. *Kentucky,* 154 U. S. 204, where the validity of an act of the legislature of Kentucky regulating the rate of tolls to be charged for traffic over a bridge between Covington, Kentucky, and Cincinnati, Ohio, was considered. In the course of the opinion this court, speaking through Mr. Justice Brown, said (p. 217):

" This case involves the right of one State to fix charges for the transportation of persons and property over a bridge connecting it with another State, without the assent of Congress or such other State, and thus involving the further inquiries, first, whether such traffic across the river is interstate commerce; and, second, whether a bridge can be considered an instrument of such commerce."

Both these questions were answered in the affirmative on the authority of *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, and *Wabash, St. Louis & Pacific Railway* v. *Illinois,* 118 U. S. 557. These cases were held to be directly in point. The first denied the right of the State to impose a tax upon the franchise of a ferry company operating between the States of Pennsylvania and New Jersey, while the second

denied to the State of Illinois the power of regulating the rates of railway charges between Illinois and New York. Where, may I ask, can the line of distinction be drawn between the *Covington Bridge case* and this? The bridge in the former case was one between Kentucky and Ohio over the Ohio River, the bridge here is over the same river between Kentucky and Indiana. Certainly, it cannot be said that there is something peculiar to the State of Indiana which causes the bridge between that State and Kentucky not to be an instrument of interstate commerce, and the traffic over it not to be interstate commerce, when the contrary is the case as to a bridge between Kentucky and Ohio.

The contention that although the traffic over the bridge may be interstate commerce and the receipts from said traffic be interstate commerce receipts, yet the tolls paid to the bridge company are not receipts from interstate commerce business transacted by the bridge company, is a mere distinction without a difference. What, may I again ask, is the toll paid to the company for the use of the bridge but the result of a contract entered into for the purpose of carrying on interstate commerce? In the *Covington Bridge case* the sole question was as to the right of the State of Kentucky to regulate the amount of tolls to be received by the bridge company. The right of the State was denied on the ground that the tolls were a matter of interstate commerce, that is, that the business of operating the bridge and charging for the use thereof was interstate commerce and not subject to state control. In that case then, the tolls were adjudged to be receipts from interstate commerce; in the case at bar, they are declared not so to be. The far-reaching consequence of this asserted distinction is well calculated to arouse solicitude for the future. A large portion of the interstate commerce business of the country is carried on by freight lines. These lines arrange with the railways for transportation, pay them a charge or toll, and upon this basis afford the public increased business facilities. Under the supposed distinction all this interstate commerce traffic ceases to be such, and the whole of the gross receipts become taxable in every State through which the

business passes. The freight lines do not transport the merchandise; the railways do; therefore the receipts of the freight lines as to such lines are not interstate commerce receipts. This illustration is but one of the many which at once suggest themselves. All the express business, the sleeping car business, the tank lines, and manifold other forms of interstate commerce, will be stricken down if the rule now applied to the tolls of an interstate bridge be enforced as to other means of interstate commerce.

Where, also, I submit, does a distinction exist between this case and the case of the ferry between Pennsylvania and New Jersey, considered in the *Gloucester Ferry case*, or the attempt of the State of Illinois to regulate freight charges between that State and New York, embraced in the *Wabash case*, *supra?* Manifestly, there is an irreconcilable conflict between the decision in this case and the rulings of the court in the cases just cited. It follows that in order to maintain the tax in the case at bar the decisions referred to must be and are, as I conceive, substantially overruled by the opinion now announced.

Nor can I see the slightest relevancy to the issues in this cause of the decision in *Erie Railroad* v. *Pennsylvania*, 158 U. S. 431. In that case, the court considered a statute of Pennsylvania which authorized the imposition of a tax upon the gross receipts of companies for tolls and transportation derived from railroads, etc., *situated within the State*. The Erie company held and operated several branch lines *lying wholly within the State of Pennsylvania*, and permitted other railroad companies to use such branch lines or portions thereof, and the taxes there in question were laid upon the tolls so received by the Erie company from its lessees. Such receipts, of course, were merely the income derived from property lying wholly within the State of Pennsylvania.

Obviously, the mere fact that corporations who practically rented property wholly in Pennsylvania and paid rent charges thereon, did business outside of the State, could not exempt the landlord (the Erie company) from paying taxes on the rentals so received from its tenants for property wholly in

Pennsylvania. Is there any ground for contending here that the Henderson bridge is wholly in Kentucky, when the fact is that it is both in Kentucky and Indiana, and that no business can be done over it which is not necessarily business done in both States and between both States? That there was no intention in the *Erie case* to question the settled doctrine as to the want of power in a State to tax interstate commerce, or the gross receipts derived therefrom, is conclusively shown by the express language of the opinion, where it was declared (p. 437) that it was needless to review the previous decisions of this court, holding that a tax laid upon gross receipts derived from interstate commerce put a burden upon commerce among the States and was void, because the proposition the decisions were quoted to sustain was regarded as thoroughly established. So, likewise, at page 438, an extract was made from the decision in *Postal Telegraph Company* v. *Charleston,* 153 U. S. 692, 695, and the doctrine there declared was approved, to wit, that a tax, by whatever name imposed, was valid where the amount of the tax was made dependent in fact on the value of the property of the taxpayer situated within the jurisdiction of the State imposing the tax.

How can it in reason be said that a case which proceeded solely upon the ground that the rentals which were taxed were the fruits of property which lay wholly within the State of Pennsylvania is authority supporting the proposition now maintained that the State of Kentucky has the right to tax the gross receipts derived from business not done wholly within the State, but consisting of tolls and charges derived from the operation of a bridge situated between that State and the State of Indiana, and which tolls and charges this court has recently declared in the *Covington Bridge case, supra,* constitute receipts from interstate commerce business?

I am authorized to state that MR. JUSTICE FIELD, MR. JUSTICE HARLAN and MR. JUSTICE BROWN concur in this dissent.